Thomas **BANKS**, Libellant,

v.

Benjamin J. **LIVERMAN** and Noah Gilliken, Respondents.

Adm. No. 7649.

United States District Court, E. D. Virginia, Norfolk Division.

April 2, 1955.

---

1.  41 U.S.C.A. § 43a, added June 30, 1952, 66 Stat. 308.

Sidney H. Kelsey, Norfolk, Va., for libellant.

White, Ryan & Reynolds, Jett, Sykes & Howell, E. L. Ryan, Jr. and Roy L. Sykes, Norfolk, Va., for respondents.

HOFFMAN, District Judge.

Thomas Banks, the libellant herein, instituted this action in admiralty against Benjamin J. Liverman and Noah Gilliken, respondents herein, to recover for personal injuries sustained by libellant while employed on board the ferry boat Norfolk, a harbor craft operating between Norfolk and Newport News, Virginia, which said ferry boat was owned and operated by the Commonwealth of Virginia, acting by and through its Department of Highways. The amended libel alleges that the accident occurred "on or about August 16, 1953", but, at the time of the trial of this action, the proctor for libellant stated that the accident actually took place on August 15, 1953. For reasons hereinafter stated, the action was not brought against the Commonwealth of Virginia or its Department of Highways. The respondents, Liverman and Gilliken, were serving as Master and Chief Engineer, respectively, of said ferry boat at the time in question.

The libellant has been following the sea since 1936 and in 1940 received his second engineer's license; in 1948 his first engineer's license; and in 1950 or 1951 his chief engineer's license. The license held by him was designated as "unlimited" for all oceans and all ships. Prior to serving on the ferry boat Norfolk at the time of the accident in question, libellant had been sailing as first assistant engineer on various liberty ships but, during the early part of the year 1953, he was without employment and, in an effort to secure a temporary position, he answered an advertisement appearing in the local press and was given employment by the Commonwealth of Virginia. He had served on several other ferry boats owned by the Commonwealth of Virginia for a period of two weeks prior to the accident. It was on his first trip on the ferry boat Norfolk that he sustained his injuries. The injuries were serious and incapacitated libellant for a long period of time. From the medical evidence adduced at the trial it appears that he has substantially recovered but is left with a 10% permanent-partial disability of his foot. Because of the Court's conclusions herein it is unnecessary to discuss the details of the injuries sustained by libellant.

At the direction of the Port Captain, Thomas M. Gard, libellant was employed as an "observer engineer" for the purpose of learning the details with respect to the engine rooms on the several vessels owned and operated by the Commonwealth of Virginia. While respondents contend that libellant was not required to do any work on board the vessels to which he was assigned, it appears from the evidence that such information was never imparted to libellant and it may be fairly assumed that libellant at least thought himself required to obey the orders of his superiors and to perform reasonable duties in connection with his work in the engine room.

The injured libellant testified that the accident took place on August 15, 1953, but it soon appeared in the course of the trial that the correct date of the accident was August 7, 1953, as libellant was taken to the United States Public Health Service Hospital for treatment for his injuries on that particular day. The ship's log introduced in evidence as libellant's Ex. 9 states (on page 5) as follows: "Engineer Tom Banks fell while working on check valve and struck head against starboard boiler. Cut a 2 inch gash. Treated at Marine Hospital and returned to work 5:30 P. M." Libellant further stated that, while he returned to work the afternoon he was injured, he was thereafter out of work for a period of three successive days. The "Employee Time Reports" intro-

duced in evidence as respondents' Exs. 3 and 4 clearly show the libellant worked on the three days following August 7, 1953; and, even if the accident occurred on the date alleged in the libel, libellant worked on August 16, 17 and 18. From the documentary evidence introduced at the time of the trial of this action, the Court concludes that this accident occurred on August 7, 1953. Libellant obviously was confused with respect to the date of the accident as he had been under the impression that he was first taken to DePaul Hospital, rather than the United States Public Health Service Hospital, and respondents' Ex. 2 does indicate that libellant was x-rayed at DePaul Hospital on August 15, 1953. While the confusion with respect to the dates as alleged in the amended libel may perhaps be understood, it is rather difficult to reconcile the testimony of libellant to the effect that he was completely out of work on the three days following the accident. Respondents contend that the variance between the allegation and proof is material, but it is unnecessary to consider this defense in view of the Court's determination of the merits of the case. The conflicting statements do, however, affect the credibility of libellant's testimony.

Libellant reported to the ferry boat Norfolk at 2:00 P. M. on August 7, 1953, and the vessel immediately proceeded on its trip to Newport News. Libellant testified that he changed his clothes and then introduced himself to the respondent, Gilliken, who was the Chief Engineer on the Norfolk. The trip from Norfolk to Newport News requires approximately 25 to 30 minutes and, according to libellant, shortly before the vessel reached Newport News, Gilliken handed libellant a 10-inch adjustable wrench and instructed him to "take up on the feed check valve". The feed check valve is clearly shown on libellant's Exs. 2 and 7, and the detail of the same is shown by a rough diagram introduced in evidence as respondents' Ex. 5. In commenting upon the photographs introduced in evidence as libellant's Exs. 2 to 8, both inclusive, it should be noted that these photographs were taken in the boiler room of the Norfolk at a time when the vessel was undergoing repairs on January 26, 1955. The miscellaneous debris and sundry obstructions are not intended to reveal the condition of the boiler room as of the date of the accident. The photographs of the feed check valve do, however, indicate the appearance of same and are sufficient for the purpose of showing the general area. When respondent, Gilliken, instructed libellant to undertake this job, according to the testimony of the libellant, Gilliken was told that it was a "shut-down" job, which would require the particular boiler to be cut off. Libellant testified that Gilliken disagreed with him and insisted, in rather strong language, that libellant should undertake the task without shutting down the boiler. There is no testimony that libellant requested Gilliken to show him how to perform this duty, although libellant testified that he was not familiar with that type of job. If libellant's testimony is to be accepted, it is reasonable to assume that he would have made some inquiry as to the nature of the work.

There is material conflict in the testimony of libellant and the respondent, Gilliken, on the details of the conversation between libellant and respondent. Gilliken stated that, shortly prior to the mooring of the ferry at Newport News, Banks approached him and asked if he (Banks) could tighten down on the packing on the starboard feed check valve. Gilliken gave permission and Banks asked the oiler (Benns) for a wrench. During this entire time Gilliken remained at the throttle and the libellant started for the boiler room. After the boat moored, Gilliken called the oiler to "take over" and went to the door of the boiler room. He there saw Banks on the grating (approximately ten feet above the floor of the boiler room) going toward the port side of the vessel and at a distance approximately five feet away from the feed check valve. Gilliken testified that he asked Banks whether or not he had completed the job and libellant replied in the affirmative. He saw libellant start descending the ladder (libellant's Exs. 3 and 4) but that he

(Gilliken) took his eyes off Banks when he was approximately two steps from the bottom of the ladder. Thereafter he noted that Banks had fallen and, in response to an inquiry from Gilliken, Banks stated, "I blacked out". Gilliken insists that he did not *order* Banks to repair the feed check valve. From the foregoing it will be noted that libellant sustained no injury while in the process of tightening the packing on the feed check valve but rather obviously was overcome from the prevailing heat in the boiler room.

Much testimony was introduced with respect to the temperature in the engine room, the boiler room, and on the outside. Again the date of the accident is material as the outside temperature on August 7, 1953, indicates the same to be 79° Fahrenheit which, for summer temperatures in this area, is admittedly not excessive. Libellant declined to state his estimate of the outside temperature but did testify that the temperature in the boiler room runs approximately 50° higher than outside temperature. He further stated that he observed a thermometer in the engine room near the stairway reading 140° which was as high as the thermometer would register. He estimated the temperature in the engine room at 160° and the temperature in the boiler room at a minimum of 180°. In substance, libellant contends that the temperature in the boiler room on the grating was 100° higher than outside temperature. Libellant did not give the details with respect to the ventilation in the engine room or boiler room but this evidence is shown from the testimony of respondents' witnesses and it appears that the boiler room has, as a part of its permanent equipment, one suction fan and one discharge fan, both of which are 28 inches by 24 inches. These fans are known as turbine driven blowers which circulate 7500 cubic feet of air per minute for each blower.

The testimony of the several witnesses introduced in behalf of the respondents vary in estimates as to the degree of temperature on the grating in the boiler room and in the vicinity of the feed check valve. It is sufficient to state that, in the opinion of the Court, a fair estimate of the temperature on the grating in the vicinity of the feed check valve at the time of this accident was between 140° and 150°. Libellant insists that there was emanating from the feed check valve a pressure of steam and water approximately 40 inches in length and that this caused the excessive heat which attributed to his subsequent "blacking out". While the Court finds that some vapor was escaping from the feed check valve, the evidence does not indicate that, under the circumstances then existing, a stream of water and steam 40 inches in length could be coming from the same. All of the evidence indicates that the task of tightening down on the packing around the feed check valve is one which is of no particular consequence and admittedly the time required to perform this duty would not exceed from five to ten minutes. It does not appear from the evidence that libellant was on the grating for any longer period of time and, in fact, it is doubtful that the entire time consumed was as much as five minutes. While libellant presented several witnesses who testified that it would be "dangerous" to perform this task under an existing temperature of 180° while the vessel was under way, all of the questions propounded to the alleged experts were based upon the assumption that the temperature had reached 180° with a leak of steam and water escaping from the feed check valve. One witness, Jesse Calhoun, did indicate that the safer procedure would be to "shut down" on the boiler before undertaking the task but this witness assigns as his primary reason the fact that pressure might tend to blow off the bonnet of the valve. Calhoun further testified that there would be absolutely no danger in undertaking the task in the absence of pressure, but that any pressure, even as little as 50 pounds, would make the job dangerous. In view of the fact that libellant was not injured in the actual performance of his duty in tightening the feed check valve, and in the absence of any affirmative evidence indicating danger in undertaking a rather menial task requiring approximately

five minutes in temperature approximating 145°, the evidence of respondents' witnesses appears to be more conclusive. All of these witnesses testified that existing temperature of the degree found by the Court herein would not create a dangerous condition to any man generally accustomed to working in boiler rooms under high temperatures, particularly when the task would not require more than a matter of five to ten minutes duty. It is, of course, probable that a task requiring a longer period of time in such temperature would be dangerous to a man not then acclimated to such heat.

■■ This action, it has been noted, was instituted against the respondent, Benjamin J. Liverman, who served as Master of the ferry boat Norfolk, and the respondent, Noah Gilliken, who served as Chief Engineer of the said ferry boat. Libellant was deprived of the privilege of suing the owner and operator of the ferry boat Norfolk by reason of the immunity granted to the Commonwealth of Virginia. Exceptions to the amended libel were filed by the respondents claiming immunity under the authority of Sayers v. Bullar, 180 Va. 222, 22 S.E.2d 9. This entire question was reviewed as a preliminary proceeding to the trial of this action, and the respondents' exceptions were overruled under the doctrine of Wynn v. Gandy, 170 Va. 590, 197 S.E. 527. The Virginia rule appears to be that employees of the State are liable for injury which is the result of their individual negligence in the performance of their duties within the scope of their employment, or for some act committed by the employee outside the scope of his authority. As the amended libel charged respondents with affirmative acts of personal negligence, the Wynn case was controlling on the question presented by respondents' exceptions. After hearing the evidence in this case, however, it would appear that the doctrine in Sayers v. Bullar, supra, is controlling as to the factual situation presented. The evidence does not establish any individual negligence on the part of either Liverman or Gilliken and, in the absence of such affirmative showing of individual negligence, the action must fail. A similar question arose in Schlmeyer v. Romeo Co., 9 Cir., 117 F.2d 996, 1941 A.M.C. 563, in which the immunity doctrine was invoked in the absence of any showing of personal negligence and, while the findings therein established the Master to be guilty of individual negligence, the Chief Engineer was exonerated under the immunity theory applicable to the Board of State Harbor Commissioners for San Francisco Harbor.

Libellant urges that the Chief Engineer, Gilliken, is liable for having given an order to perform a dangerous task. As heretofore noted, the Court has rejected libellant's testimony that an "order" was given. However, it is admittedly true that Gilliken had full knowledge of the fact libellant was about to undertake the duty of tightening the packing on the feed check valve. Presumably Gilliken also knew the approximate temperature in the boiler room. Was it negligence to permit libellant to work on the feed check valve? What effect, if any, does the doctrine of assumption of risk have as applied to the facts of this case?

■ This proceeding is not under the Jones Act, 46 U.S.C.A. § 688, which constitutes a modified common law remedy for negligent injury in which the assumption of risk defense is much weakened. Under general admiralty law it appears that a seaman assumes risks normally incident to his calling, but not the risk of negligent failure to provide a seaworthy ship and safe appliances. If libellant has any just cause to complain in this case, it rests upon unseaworthiness in failing to provide adequate ventilation. Certainly the respondents in this case cannot be charged with the duty of making structural changes necessary to correct this defect if, in fact, such exists. This is the responsibility of the shipowner who, in this case, is not a party to the action and is further protected under the immunity doctrine. Whittle v. Atlas Powder Co., D.C., 34 F.Supp. 563; 57 C. J.S., Master and Servant, § 578, p. 350. It must be remembered that libellant was

employed and injured on a harbor craft; that he served on a regular shift; and that he would leave the vessel at the conclusion of his duty and return to his home. The particular facts of libellant's employment are strikingly similar to those set forth in Skolar v. Lehigh Valley R. Co., 2 Cir., 60 F.2d 893, wherein the Court applied the analogy of a stevedore in determining whether the doctrine of assumption of risk should be held applicable. To the same effect see: Bruszewski v. Isthmian S. S. Co., D.C., 66 F.Supp. 210; Olszewski v. United Fruit Co., D.C., 34 F.Supp. 113; Scheffler v. Moran Towing and Transportation Co., Inc., 2 Cir., 68 F.2d 11, opinion by Judge Learned Hand. In view of the Court's finding of no personal negligence on the part of respondents, it is unnecessary to discuss the assumption of risk doctrine but, if called upon to do so, it would appear that libellant herein, an experienced engineer, voluntarily assumed the risk of the high temperature in the boiler room on this harbor craft in attempting to perform a rather minor task which required only a relatively few minutes. Even if the Court assumed that libellant had been *ordered* to perform this task, it is extremely doubtful that this constitutes negligence. In The Saguache, 2 Cir., 112 F.2d 482, 484, the Court said:

"It cannot be said that a seaman ought not to be directed to do cleaning in the fire room because he will get in a profuse perspiration".

The authorities cited by libellant are clearly distinguishable as they involve actions against shipowners who are responsible for the seaworthiness of the vessel and are equally liable for the negligence of employees in giving negligent orders.

At the time of argument the Court indicated that it might permit the introduction of additional evidence to establish what degree of temperature in a boiler room constituted an unsafe condition under the circumstances of this case. In light of the findings herein stated, additional evidence would not assist the Court in arriving at a contrary conclusion.

The libel is dismissed and an order will be entered in accordance with this opinion which is adopted as the findings of fact and conclusions of law.