**J. LAURITZEN, Owner M/S BELLA DAN, Libelant,**

v.

**CHESAPEAKE BAY BRIDGE AND TUNNEL DISTRICT, and Tidewater Construction Corporation, Raymond International Inc., and Peter Kewit Sons' Company, a joint venture, trading as Tidewater-Raymond-Kewit and Merritt-Chapman and Scott Corporation, Respondents.**

No. 8678.

United States District Court
E. D. Virginia,
Norfolk Division.
Oct. 20, 1966.

Vandeventer, Black, Meredith & Martin, Norfolk, Va., Hugh S. Meredith, Norfolk, Va., for libelant.

Seawell, McCoy, Winston & Dalton, R. M. Hughes, III, Norfolk, Va., for Chesapeake Bay Bridge & Tunnel Dist.

Jett, Sykes & Berkley, R. Arthur Jett, Norfolk, Va., for Tidewater Construction Corp.

Williams, Cocke, Worrell & Kelly, Jack E. Greer, Norfolk, Va., for Merritt-Chapman & Scott Corp.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

The question to be decided on respondent's exceptions to the libel filed herein is whether the Chesapeake Bay Bridge and Tunnel District, a political subdivision of the State of Virginia, is immune from an action brought in admiralty to recover damages to libelant's vessel arising from the ship's striking an underwater obstruction which respondent allegedly permitted to remain in a navigable ship channel following the construction of the seventeen mile bridge-tunnel project crossing the Chesapeake Bay. We hold that, under the particular facts of this case, respondent is not immune from suit.

The Chesapeake Bay Bridge and Tunnel District was created by the 1962 Virginia Acts of Assembly, Chapter 605, approved March 31, 1962. The Act provides, in part, that the District may—

"sue and be sued, and by and through the Chesapeake Bay Bridge and Tunnel Commission hereinafter created as the governing board thereof, the district may plead and be impleaded, and contract with, individuals, partnerships, associations, private corporations, municipal corporations, political subdivisions of the State of Virginia, and the federal government or any agency thereof having any interest or title in and to property, rights, easements or franchises authorized to be acquired by this act."

The Act also created the Chesapeake Bay Bridge and Tunnel Commission and provided for the selection of its members.

As required by federal law, 33 U.S.C. § 401, plans for the proposed Chesapeake Bay Bridge-Tunnel were submitted to the Corps of Engineers of the United States Army for approval. On August 1, 1958, a permit was issued by the Corps of Engineers approving the bridge-tunnel plans, subject to certain enumerated conditions.[1] Among these conditions were the requirements that all work should be conducted so as not to unreasonably interfere with navigation; that the navigable waters over and under the structure would be promptly cleared of all "false work, piling, and other obstructions resulting from construction of the bridge-tunnel system"; that no refuse piles should be allowed to remain on the bottom of the bay; and that the Commission would be responsible for the operation and maintenance of all permanent navigation aids and lights "at and approaching the navigation openings of the tunnel and bridges." These conditions have the force and effect of law. 33 U.S.C. § 525. Moreover, by applying for and receiving a permit to construct the bridge-tunnel project on the terms and conditions set forth therein, the political subdivision submitted itself to federal law, at least insofar as it directly affects foreign and interstate commerce, including navigation.

---

1. This permit was issued to the Chesapeake Bay Ferry Commission, the predecessor of the present Bridge and Tunnel Commission.

The bridge-tunnel was completed in 1964. On May 21, 1965, the M/S BELLA DAN was proceeding inbound in Thimble Shoals channel when it allegedly struck a submerged object in the vicinity of the bridge-tunnel causing allegedly extensive damage to the ship's hull. The submerged object is believed to have been a navigational light structure which had previously been either knocked down or had collapsed during a storm. Libelant brought the present action against the Bridge-Tunnel District and against certain contractors which were involved in the construction of the bridge-tunnel. We are concerned here only with whether this suit can be maintained against the Bridge and Tunnel District in light of the defense of sovereign immunity.

It is not disputed that the Bridge and Tunnel District is a political subdivision of the State of Virginia and, under state law, such subdivisions have been held to be immune from any action predicated on tort liability even where the Act creating the District contains a "sue and be sued" clause, as in the present case. Elizabeth River Tunnel District v. Beecher, 202 Va. 452, 117 S.E.2d 685, 85 A.L.R.2d 469 (1961). The *Beecher* case involved an inter-urban bus transportation facility provided for under contract between the Elizabeth River Tunnel District and the bus company. There was no issue raised in *Beecher* as to interstate or foreign commerce. We think it clear that the basis of libelant's claim is a maritime tort. Eastern Transportation Company v. United States, 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472. A preliminary issue, therefore, is whether the state law should be applied or whether federal law is controlling, since Virginia law would appear to effectively uphold the defense of sovereign immunity.

In Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1958), petitioner sued in a federal district court to recover under the Jones Act for the death of her husband while working aboard a Mississippi River ferryboat owned by respondent, an agency of the states of Tennessee and Missouri created by a compact which was entered into between them with the consent of Congress. The compact authorized respondent "to sue and be sued" and the Act of Congress approving same provided that it should not be construed "to affect, impair, or diminish any right, power or jurisdiction of * * * any court * * * of the United States, or over or in regard to any navigable waters, or any commerce between the States." The district court dismissed the suit on the ground that the Commission was immune from tort liability, 153 F.Supp. 512, and the Court of Appeals affirmed, 8 Cir., 254 F.2d 857. The Supreme Court reversed, holding that the individual states involved had waived their sovereign immunity by entering into a compact approved by Congress. Under the circumstances, the construction of the "sue and be sued" clause was a matter of federal, not state law. Thus, even though both Tennessee and Missouri construed such clauses strictly (as does Virginia), their construction would not prohibit a suit brought in the federal court.

It is true that the *Petty* case is distinguishable from the present case, since it involved an interstate compact that had been expressly approved by Congress as well as a proviso protecting the jurisdiction of the federal courts. But in the more recent case of Parden v. Terminal R. of Alabama State Docks Dept., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), the Supreme Court went a step further. In that case the petitioners brought suit in the federal district court in Alabama against respondent railway company, a state-owned railroad engaged in interstate commerce, for personal injuries sustained while employed by the railway. The district court dismissed the action on the ground of sovereign immunity, and the Court of Appeals affirmed, 5 Cir., 311 F.2d 727. The Supreme Court reversed, holding that the State of Alabama had waived its sovereign immunity and necessarily consented to be sued in federal courts when it

entered the field of interstate commerce, an area regulated by Congress. Referring to the *Petty* decision, the Court stated:

"The broad principle of the *Petty* case is thus applicable here: Where a State's consent to suit is alleged to arise from an act not wholly within its own sphere of authority but within a sphere—whether it be interstate compacts or interstate commerce—subject to the constitutional power of the Federal Government, the question whether the State's act constitutes the alleged consent is one of federal law. Here, as in *Petty*, the States by venturing into the congressional realm 'assume the conditions that Congress under the Constitution attached.' 359 U.S., at 281–282, 79 S.Ct., at 790."

The Court then went further to state:

"Our conclusion that this suit may be maintained is in accord with the common sense of this Nation's federalism. A State's immunity from suit by an individual without its consent has been fully recognized by the Eleventh Amendment and by subsequent decisions of this Court. But when a State leaves the sphere that is exclusively its own and enters into activities subject to congressional regulation, it subjects itself to that regulation as fully as if it were a private person or corporation."

■ We believe that these two decisions are controlling in the present instance,[2] not only as to what law applies but also as to whether there has been a waiver of sovereign immunity. When the State of Virginia permitted the construction of the Chesapeake Bay Bridge-Tunnel it clearly entered the twin spheres of interstate commerce and navigation which are indisputably subject to federal control. Not only does the bridge-tunnel serve as a major artery for north-south interstate traffic, but it also spans one of the most important bodies of navigable waters in the United States through which a great volume of interstate and foreign commerce traverses the waters daily. Before the construction of the bridge-tunnel could even be started, it was necessary, under federal law, to obtain approval of the plans by the Chief of Engineers and the Secretary of the Army. Clearly when the State of Virginia embarked on this project it became subject to the federal laws and regulations pertaining to navigation, the same as any private individual would be. To hold otherwise would result in immunity which would breed carelessness for the Bridge and Tunnel District remains responsible for the operation and maintenance of all permanent navigation aids and lights. It is inconceivable that the Bridge and Tunnel District could successfully invoke the doctrine of sovereign immunity if one of its employees should negligently cut off the permanent navigation lights which the District is charged with operating and maintaining, thereby resulting in substantial damage to a vessel using the channel entrance to the Port of Hampton Roads.

Respondent does not dispute that it is subject to the federal laws pertaining to navigable waters, but it argues that these laws do not create any cause of action in favor of injured third parties such as the libelant here. It points out that the regulations prohibiting the obstruction of navigable waters do no more than establish a standard of care and give the United States the power of enforce-

---

2. Cases decided prior to *Petty* and *Parden* are of little value. See: Banks v. Liverman (E.D.Va., 1955) 129 F.Supp. 743, aff'd. 4 Cir., 226 F.2d 524, In J. Ray McDermott & Co., Inc. v. Department of Highways, 5 Cir., 1959, 267 F.2d 317, cert. den. 361 U.S. 914, 80 S.Ct. 259, 4 L.Ed.2d 184, the *Petty* case had previously been decided, but not *Parden* and, additionally, the action was against a State Highway Commission with no "sue and be sued" clause. A case which did not involve a "sue and be sued" clause, but was subsequent to *Petty* and *Parden* is DeLong Corp. v. Oregon State Highway Comm'r., (D.Or.1964) 233 F.Supp. 7, aff'd. 9 Cir., 343 F.2d 911, cert. den. 382 U.S. 877, 86 S.Ct. 161, 15 L.Ed.2d 119.

ment, whereas the Federal Employers' Liability Act, under which petitioners sued in the *Parden* case, expressly created a cause of action for injured employees against "[e]very common carrier by railroad while engaging in commerce between any of the several States * * *." 45 U.S.C. § 51.

It is true that the federal navigation regulations do not expressly provide a cause of action for injured parties as does the FELA, but such liability is clearly implied. Even though it be conceded that the statutes pertaining to the protection of navigable waters, 33 U.S.C. § 401 et seq., are penal in nature, it is clear that civil liability may be derived therefrom, both in favor of the United States, United States v. Perma Paving Co., 332 F.2d 754 (2 Cir. 1964), and private parties, Morania Barge No. 140, Inc. v. M. & J. Tracy, Inc., 312 F.2d 78 (2 Cir. 1962). Violation of the navigation laws gives rise to a presumption of negligence, which, if not rebutted, may result in liability to the negligent party. Reading Co. v. Pope & Talbot, Inc., 192 F.Supp. 663 (E.D.Penn. 1961), aff'd 295 F.2d 40 (3 Cir. 1961). We think it is evident that the regulations pertaining to the obstruction of navigable waters were manifestly intended for the protection of private parties such as the libelant here, even though the enforcement of these provisions was vested in the United States. United States v. Republic Steel Corporation, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903; Texas & Pac. Ry. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874; United States v. State of California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567; State of California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034.

Furthermore, an examination of the historical background of the FELA explains, we think, the reason why that Act expressly provided a cause of action for injured railway employees. The FELA was enacted because Congress was dissatisfied with the common-law duty of the master to his servant. See Rogers

v. Missouri Pacific R. R. Co., 352 U.S. 500, 507, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), rehearing denied 353 U.S. 943. The purpose of FELA was to enlarge the remedy of railroad employees, and it accomplished this by eliminating the common-law defenses of contributory negligence, assumption of risk, contract not to sue, and the fellow-servant rule. Metropolitan Coal Co. v. Johnson, 265 F.2d 173 (1 Cir. 1959); Slaughter v. Atlantic Coast Line R. R. Co., 112 U.S. App.D.C. 327, 302 F.2d 912 (1962), cert. den. 371 U.S. 827, 83 S.Ct. 48, 9 L.Ed.2d 65. In essence, it substituted a new statutory remedy for an overly restricted common-law remedy. But we perceive no sound reason for holding that a state has waived its immunity from suit where a federal law expressly grants a right of action, as in *Parden,* and denying such a waiver when civil liability clearly exists but it is not expressly mentioned, as in this case. The proper test, we believe, is whether the state has knowingly and directly entered a field which is subject to federal regulation, such as interstate or foreign commerce. If so, it must be deemed to have consented to suit to the same extent as a private individual. A contrary ruling would result in the same injustice which gave the Supreme Court cause for concern in the *Parden* case; namely, that injured parties would have a remedy when hurt by a private individual but would be remediless if the state, through its entry into the field of interstate or foreign commerce, happened to be the party at fault. When a state elects to enter the realm of interstate or foreign commerce it must be prepared to shoulder the attendant responsibility.

We express no opinion as to whether this Court would reach a similar result under a different factual situation, such as one involving a motor vehicle accident on the bridge-tunnel itself. The fact that the present suit arose from an accident on navigable waters directly affecting the operation of a vessel in a ship's channel, and was brought in ad-

miralty[3] is, we think, a significant factor. Nor does today's decision in any way constitute an opinion as to liability in this case. We hold only that the Chesapeake Bay Bridge and Tunnel District, by entering into the realm of interstate commerce and navigation, impliedly waived its Eleventh Amendment immunity from suit to the extent that interstate commerce and navigation may be directly affected thereby.

Acknowledging that the question is not free from doubt, and mindful of the fact that a prolonged trial may be avoided if the issue discussed herein is determined with greater finality than this Court is able to render, the Court will certify the matter for an appeal from an interlocutory decree upon request of the respondent, Chesapeake Bay Bridge and Tunnel District.

---

3. See the discussion of the state's authority to deprive an admiralty court of the right to redress a wrong in In Re Neuces County, Texas, Road District No. 4, 174 F.Supp. 846, relying upon Workman v. New York City, 179 U.S. 552, 21 S.Ct. 212, 45 L.Ed. 314.