**POTOMAC RIVER ASSOCIATION, INC., a Maryland Corporation, and Watermen's Association of St. Mary's County, Inc., a Maryland Corporation**

v.

**LUNDEBERG MARYLAND SEAMANSHIP SCHOOL, INC., a Maryland Corporation, et al.**

**Civ. No. 73-789-Y.**

United States District Court,
D. Maryland.

April 11, 1975.

Bernard S. Cohen, Geoffrey Judd Vitt, and Stephen D. Annand, Alexandria, Va., and John J. O'Connor, Baltimore, Md., for plaintiffs.

Aubrey M. Daniel, III, Terry M. Rose, Washington, D.C., and Solomon Kaplan, Baltimore, Md., for defendants Lundeberg Maryland Seamanship School, Inc., Harry Lundeberg School of Seamanship, and Seafarers Piney Point Corp.

William L. Want, Dept. of Justice, Washington, D.C., and James M. Kramon, Assistant United States Atty., Baltimore, Md., for defendants McGarry and Callaway.

JOSEPH H. YOUNG, District Judge:

In this environmental tangle two citizens' organizations seek to curtail dredging and filling activities which have allegedly despoiled St. George Creek in St. Mary's County, Maryland.[1] Plaintiff Potomac River Association, Inc., is a non-profit citizens' association of St. Mary's County residents who use and enjoy the resources of St. George Creek. The Watermen's Association of St.

---

1. The Creek is alleged to be a navigable waterway of the United States; this allega-

tion has not been challenged by the defendants.

Mary's County is a non-profit organization of County residents who derive their livelihood from tonging oysters in St. George Creek and other local waterways. Both the Potomac River Association and the Watermen's Association have dedicated themselves to the preservation of the economic resources and aesthetic amenities of the Creek.[2]

Private defendant Lundeberg Maryland Seamanship School, Inc., is a Maryland corporation which owns a large tract of land at Piney Point, in St. Mary's County, which abuts St. George Creek. This corporation, in turn, owns the other private defendant, the Harry Lundeberg School of Seamanship, a New York trust.[3] Both corporations have allegedly cooperated in the illegal dredging, filling and bulkheading of St. George Creek at the Piney Point property.

The plaintiffs' second amended complaint alleges generally that the activity of the private defendants in dredging, filling and bulkheading their land along the Creek has damaged the natural marine environment of the Creek and reduced the previously productive oyster industry of the Creek by 77 percent. Plaintiffs allege that negligent construction and maintenance of conduits for dredged materials have allowed waste to enter the stream, and that dredging and filling have caused an accumulation of silt, which has resulted in the smothering and killing of oysters. Plaintiffs also allege that the private defendants have dredged through oyster beds and abandoned six boats in the stream.[4]

The federal defendants are Colonel Robert S. McGarry, the District Engineer for the Baltimore District of the United States Army Corps of Engineers, and Howard Calloway, the Secretary of the Army, who has control and jurisdiction over the Army Corps of Engineers. Beginning in May, 1968, the private defendants sought and procured from the Corps of Engineers five permits for dredging and filling on their Piney Point property. Those permits were issued as follows:[5]

| Permit | Permit Number | Date of Issuance | Date of Expiration |
|--------|---------------|------------------|--------------------|
| 1 | NABOP–P2 | 5/16/68 | 12/31/71 |
| 2 | NABOP–P4 | 4/1/68 | 12/31/71 |
| 3 | NABOP–P7 | 7/19/69 | 12/31/72 |
| 4 | NABOP–P9 | 11/25/69 | 12/31/72 |
| 5 | NABOP–P–10 | 6/10/70 | 12/31/73 |

Permits 1 and 2 expired, before the institution of this action, on September 26, 1972; permits 3, 4 and 5 have since expired. An application for an extension of permit 2 was filed with the Corps on March 22, 1972, and is now

2. The complaint is carefully worded to fall within the "injury in fact" test of *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Both groups have alleged that their individual members have suffered economic and aesthetic injuries.

3. Both defendants are corporate appendages of the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO, a previously dismissed defendant in this action.

4. The offending pipes have now been removed, and the defendants have arranged to move the boats in conjunction with the St. Mary's County Department of Health.

5. Defendants have also received seven dredge and fill permits form the Maryland Board of Public Works; another permit application is now pending with that Board.

pending; final decision on the permit extension has been postponed pending the outcome of this litigation.[6]

Plaintiffs contend that the private defendants have conducted dredging and filling operations beyond the scope of these permits and in violation of the conditions on permits imposed by Corps regulations, *see, e. g.*, 33 C.F.R. § 209.-120(m)(2)(1974). On several occasions, plaintiffs complained of the private defendants' activities to the Corps, whose investigations confirmed the violations. By implication, the plaintiffs contend that the Corps has ignored these repeated violations when issuing new permits. On certain occasions, the Maryland Department of Water Resources found that the private defendants were in violation of Maryland water quality standards and the conditions set forth in both the federal and state permits, and halted the defendants' activities.

The Corps did not execute an environmental impact statement [EIS] under section 102(C)(2) of the National Environmental Policy Act of 1969 [NEPA], 42 U.S.C. § 4332(C)(ii) (1970), for permit number 5, the only permit issued after the effective date of the Act; nor has an impact statement been prepared on the presently pending permit application.

Plaintiffs have asserted a barrage of causes of action and jurisdictional grounds. The substantive theories of relief are as follows:

1. A private cause of action under NEPA and the Administrative Procedure Act [APA], 5 U.S.C. § 701 *et seq.*, to require the Corps to complete an EIS for permit 5 and the extension of permit 2;

2. A private cause of action under section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, for damages against the private defendants for harm to the Creek which has resulted

in injury to the plaintiffs and their members, and for injunctive relief in the form of restoration of the Creek;

3. A private cause of action under the APA, NEPA, the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 *et seq.* (1970), and the Rivers and Harbors Act, to prevent the Corps from issuing any further permits to the private defendants and to prevent the private defendants from engaging in any further dredging or filling along the Creek; and

4. A pendent state claim for violation of Md.Ann.Code, Nat.Res. Art, § 8–1413 (1974), formerly Md.Ann.Code art. 96 [A], § 26, which prohibits pollution of the waters of the State of Maryland and declares such pollution to be a public nuisance.

Plaintiffs rely on 28 U.S.C. §§ 1331, 1333, 1343(3) and (4) and the APA to invoke the subject matter jurisdiction of the court. They also ask for declaratory relief under 28 U.S.C. §§ 2201 and 2202.

All federal defendants have moved to dismiss the complaint, arguing that the doctrines of primary jurisdiction, exhaustion of remedies, ripeness and mootness prevent the Court from considering all issues at this time. The private defendants have moved to dismiss, attacking subject matter jurisdiction alleged by the plaintiffs under Title 28 and the APA, and by challenging the plaintiffs' ability to state a claim on which relief can be granted under the myriad of federal laws which the plaintiffs have advanced.

## FEDERAL DEFENDANTS' MOTION TO DISMISS

Plaintiffs have requested three forms of relief from the federal defendants: first, they seek a declaration that the continued failure of the Corps to protect the economic and commercial value of subaqueous land held in trust for the public is in violation of the rights of the plaintiffs and the people of the United

---

6. The extension has been treated as an application for a new permit under Corps regulation 209.120(*o*). Plaintiffs have been invited to, and the Potomac River Association has in fact submitted statements opposing the permit to the Corps under the Corps' public notice procedures, 33 C.F.R. 209.120(j).

States; second, they request this Court to order the Corps to revoke and suspend all permits heretofore issued to the private defendants for the purpose of dredging and filling St. George Creek and to order the Corps to prepare an EIS for permits 5 and 6; and finally, they request the Court to enjoin the Corps from issuing any further permits to the private defendants.

■ The defendants' objections to the requested relief, as discussed *infra*, are well taken, and the motion to dismiss will therefore be granted. Such relief is moot as to permits 1 through 5 because all work under the permits has been completed, and the permits have now expired. The relief requested as to the extension of permit 2 is inappropriate because the Corps has not yet acted on the permit.

*Permits 1 through 5*

■ This Court received this case by transfer under 28 U.S.C. § 1404 on August 8, 1973. By that time permits 1 through 5 had expired, and all work authorized under the permits had been completed by the private defendants, raising the question of whether the expiration of the permits and the completion of the work renders the requested relief moot as to the federal defendants.

■ The question of mootness must be resolved before a court may assume jurisdiction, *Henry v. Mississippi,* 379 U.S. 443, 447, 85 S.Ct. 564, 13 L. Ed.2d 408 (1965), because mootness goes to the constitutional requirement in Article III that a court may only decide actual cases and controversies. *See Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n.3, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964). A court may not give an opinion where it cannot grant relief or affect the rights of the litigants before it. *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Employees Div. 998 v. Employment Relations Board,* 340 U.S. 416, 418, 71 S. Ct. 373, 95 L.Ed. 389 (1951), *quoting, St. Pierre v. United States,* 319 U.S. 41, 42, 63 S.Ct. 910, 87 L.Ed. 1199 (1943).

When it appears that the thing sought to be prevented has been done and cannot be undone by an order of the court binding the parties before it, the case is moot. *See Dyer v. S.E.C.,* 251 F.2d 512, 513 (8th Cir. 1958), *vacated,* 359 U.S. 499, 79 S.Ct. 1115, 3 L.Ed.2d 976 *judgment recalled,* 361 U.S. 803, 80 S.Ct. 40, 4 L.Ed.2d 52 (1959), *quoting, Jones v. Montague,* 194 U.S. 147, 158, 24 S.Ct. 611, 48 L.Ed. 913 (1904). Although the situation with regard to the private defendants is different, there is no binding order that could be given which would change the relationship between the plaintiffs and the Government vis à vis the five expired permits.

■■ Nor does this case come within the recognized exceptions of the mootness doctrine. *See generally, Note, the Mootness Doctrine in the Supreme Court,* 88 Harv.L.Rev. 373 (1974). This is not a case "capable of repetition, yet evading review." *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L. Ed.2d 147 (1973); *Southern Pacific Terminal Co. v. I.C.C.,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). The permits here are not "short term orders" which may expire before the case reaches our consideration. Judicial review from an administrative decision of the Corps to grant or deny a permit is immediately available to persons aggrieved by the Corps' decisions, and the average life of the five expired permits was three years. Plaintiffs had ample opportunity to pursue their remedies against the Corps during that time. This is also not a case where continuing governmental policy affects the relationship of the parties despite expiration of the permits. *Cf. Super Tire Eng'r Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Carroll v. President and Commissioners,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). Instead, the Corps has a specific set of procedures geared to operate differently for every permit application. A NEPA statement

could be required for one application and not required for the next permit on the same site; likewise the Corps may grant one permit application and refuse to grant the next application for the same activities on the same site, should it find that the operative conditions governing the issuance of the permit have changed.

Because another application is pending, the plaintiffs will have the opportunity to challenge the procedures of the Corps if and when the Corps grants the extension on permit 2. As in *De Funis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), the case is certainly capable of repetition, but it will not evade review.

■ The related doctrines of primary jurisdiction and ripeness prevent consideration of whether the corps should or should not grant the application for the sixth permit. Both doctrines concern whether a court should preempt an agency from making initial decisions on certain issues. On the other hand, deference to an agency under either doctrine does not mean that a court is forever precluded from considering or reviewing the issues.

■ The doctrine of primary jurisdiction operates when jurisdiction is appropriate in a court or an agency, or when jurisdiction is appropriate in an agency and equitable principles might permit a court to intervene in agency procedures. Primary jurisdiction is applied to determine whether the court should postpone exercising its jurisdiction until the agency has had a chance to come to a final decision on the issues. *See* 3 Davis, *Administrative Law* § 19.01 (1970 Supp.). Judicial remedies are not excluded but postponed pending consideration by an agency with particular expertise in an area in which the agency enforces a comprehensive regulatory scheme. *United States v. Philadelphia*

*Nat'l Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *United States v. Western Pac. R.R.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). Once the agency has made a final determination, jurisdiction may then be exercised by the court to the extent allowed by laws governing scope and nature of review. *See generally Note, Environmental Law, Primary Jurisdiction*, 1972 Wis.L.Rev. 934.

■ Only under extraordinary circumstances may a court "short-cut" agency determination; in those cases the need for intervention must be clear and immediate. *Sears, Roebuck & Co. v. NLRB*, 153 U.S.App.D.C. 380, 473 F.2d 91 (1972), *cert. denied*, 415 U.S. 950, 94 S.Ct. 1474, 39 L.Ed.2d 566 (1974). Such action is not warranted here. Considering the increasing sophistication of the Corps permit program under the Rivers and Harbors Act in recent years and the Corps' peculiar knowledge, not only of the environmental consequences of dredge and fill operations but of the activities of the private defendants, the harm which the plaintiffs foresee from the granting of the permit extension does not outweigh the interest of the Corps in maintaining uniformity and continuity in its regulatory scheme. That scheme, established at 33 C.F.R. § 209.120 pursuant to section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, establishes specific criteria for evaluating permit applications, *see* 33 C.F.R. § 209.120(f) and (g), and for the preparation of environmental impact statements as required by NEPA, *see* 33 C.F.R. §§ 209.120(1)(1–3) and 209.410.[7] The regulations also establish strict procedures for the processing of applications, 33 C.F.R. § 209.120(i), which include requirements for notification of state and federal agencies which deal with environmental resources and the public. These procedures are adequate to

---

7. The Corps' NEPA guidelines were issued *after* permit 5 had been granted, 31 Fed.Reg. 2525 (February 2, 1972). They provide a detailed mechanism for filing a negative statement should the Corps determine an impact statement is not needed.

protect the interest of the public in general and the plaintiffs in particular.

▮ Whereas the doctrine of primary jurisdiction governs whether conditions are such that initial decisions on a permit may be had in this Court rather than by the Corps, the doctrine of ripeness goes to the timing of judicial review. It requires that an issue before a court must be sufficiently clarified and finally decided by the administrative agency before review. The general policy underlying the ripeness doctrine is to prevent courts from entangling themselves prematurely in the decision-making process. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Where an agency has made an initial determination to file or not to file an impact statement, a court may not review that decision prior to a final decision on a permit or license.[8] *Greene County Planning Bd. v. FPC,* 490 F.2d 256 (2nd Cir. 1973); *Environmental Defense Fund, Inc. v. Brinegar,* 4 E.L.R. 20534 (E.D.Pa.1974).

▮ Once the Corps has made its determination, this Court may then review its decision under the applicable scope of review provided by the Administrative Procedures Act and the courts. *See, e. g., Conservation Council v. Froehlke,* 473 F.2d 664, 665 (4th Cir. 1973); *Ely v. Velde,* 451 F.2d 1130, 1138 (4th Cir. 1971); *Calvert Cliffs Coordinating Committee v. A.E.C.,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971).

▮ It is necessary to address the problem of the plaintiffs' allegations of repeated misconduct on the part of the private defendants in dredging and filling illegally beyond the scope of their permits. In evaluating a permit or a permit extension, the Corps must consider the beneficial and detrimental effects of a proposed project on the environment, economics, conservation, aesthetics, fish and wildlife, water quality, and the needs and welfare of the public. See 33 C.F.R. 209.120(f)(1) and (2). Therefore, when considering an application for a new permit or for an extension of an old permit, the Corps *must* take into account whether the applicant has at any time engaged in operations which required a permit but for which the applicant did not procure a permit. Dredging and filling beyond the scope of a permit or in violation of an issued permit as documented by the Corps or as proved to the Corps by any interested party during the permit application procedure, is conduct which the Corps must consider under its guidelines. Such a finding should weigh heavily against the issuance of a permit extension or may warrant the attaching of conditions necessary to protect the public interest.

To the extent that the parties have filed matters outside the pleadings the motion will be considered as one for summary judgment. The motion of the federal defendants will be granted. The Court will retain jurisdiction over the federal defendants only in order that plaintiffs may apply to this Court under the APA for review of a Corps decision should they have occasion to do so.

### PRIVATE DEFENDANTS' MOTION TO DISMISS

▮ The private defendants have challenged jurisdiction of the Court over them under 28 U.S.C. §§ 1331, 1333, and 1343(3) and (4).[9] As dis-

8. Plaintiff's request for declaratory relief must fail because the Declaratory Judgment Act cannot provide a basis for relief when a court has otherwise refused to exercise jurisdiction. 6A J. Moore, Federal Practice, ¶ 57.05, at 57–24 (1974).

9. Although the complaint is not crystal clear in this respect, a careful reading indicates that the use of NEPA, the Fish and Wildlife Coordination Act, the Federal Water Pollution Control Act and the APA go only to jurisdiction over the federal defendants. *See* Complaint, ¶ 28–30. In any case these acts would not support jurisdiction over the private defendants. *See, e. g., Tanner v. Armco Steel Corp.,* 340 F.Supp. 532, 537 (S.D.Tex. 1972) (NEPA).

cussed below, admirality and federal question jurisdiction both provide a foundation, albeit a limited one, for the plaintiffs' suit.

■■■ 28 U.S.C. § 1331(a) requires that a cause of action must be raised which "arises under the Constitution, laws, or treaties of the United States." The classic test of federal question jurisdiction was given by Justice Cardozo in *Gully v. First National Bank,* 299 U. S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936):

> To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another.

299 U.S. at 112, 57 S.Ct. at 97 (citations omitted). Because, as found below, the Rivers and Harbors Act does support a cause of action by one private party against another under limited circumstances, jurisdiction exists under section 1331(a) whether the cause of action is regarded as having a general federal source, or whether an implied cause of action arises from the Rivers and Harbors Act. *See* Note, *Implying Civil Remedies from Federal Regulatory Statutes,* 7 Harv.L.Rev. 285, 287 (1963).

Environmental litigation has raised a panoply of problems for the courts. Considering the resurrection of old statutes such as the Rivers and Harbors Act Amendments of 1972, and the attention drawn to the environmental ramifica-

tions of all major federal activities by NEPA, it is sometimes difficult to perceive the underlying structure of the conflict between the parties. Therefore, when resolving problems of competing environmental uses, it is wise to consider not only the legal relations, but also the social relations between the parties. More often than not, discussion of the latter leads to inevitable conclusions regarding the former.

The social effects of any course of action are reciprocal. When a choice between A's use of a waterway (fishing, tonging), and B's use of the same waterway (waste disposal), is presented, the problem is not simply whether B should pay A or A should pay B but which arrangement will produce the maximum absolute social benefit. An integral corollary to this proposition is the question of how the costs of the social arrangement should be distributed between A and B.

Relating this analysis to the case at hand, it is evident that this Court has been asked to determine if B should pay A, rather than the *primary* question— which use of St. George's Creek would be of the greatest benefit to society. Nevertheless, any consideration of the question of allocation of cost without a corresponding discussion of where the use decision has been placed, would be remiss when determining whether a private cause of acton exists under the Rivers and Harbors Act.[10]

■■ A perusal of the Corps' regulations enacted pursuant to section 10 of the Rivers and Harbors Act reveals that Congress has placed responsibility for

---

Plaintiffs' claims under the civil rights statutes must fail because a sufficient quantum of state action has not been alleged to bring the incident here within the ambit of the civil rights statutes. The act of licensing or issuing permits by the Maryland Board of Public Works is insufficient to constitute state action for the purpose of involving the State in the acts of the defendants. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Tanner v. Armco Steel,* 340 F.Supp. 532, 536 (S.D.

Tex.1972); *Guthrie v. Alabama By-Products Co.,* 328 F.Supp. 1140, 1143 (N.D.Ala.1971), *aff'd per curiam,* 456 F.2d 1294 (5th Cir. 1972), *cert. denied,* 410 U.S. 946, 93 S.Ct. 1352, 35 L.Ed.2d 613 (1973).

10. For the purpose of this motion, it is assumed that the plaintiffs have sued for damages for all activities conducted by the defendants at Piney Point, both within and in excess of the Corps permits.

allocating the use of the Nation's waterways with the Corps of Engineers. The Corps may only make such use decisions when presented with a permit application. Nevertheless, when it does consider an application, it must consider a number of factors to arrive at a decision as to whether the authorization of a new use is a better social arrangement than the preexisting use of the waterway. The language of the regulations clearly contemplates a cost/benefit analysis of economic, historical, environmental and aesthetic factors:

> Evaluation of the probable impact which the proposed structure or work may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefit which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of the general balancing process. . . .

33 C.F.R. § 209.120(f)(1) (1974).[11]

The general criteria for analysis listed in the same section further reflect the comprehensive nature of the analysis which the Corps must undertake in reaching its decision:

> (2) The following criteria will be considered in the evaluation of every application:
>
> (i) the relative extent of the public and private need for the proposed structure or work;
>
> (ii) the desirability of using appropriate alternative locations and methods to accomplish the objective or the proposed structure or work;

> (iii) the extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work may have on the public and private uses to which the area is suited; and
>
> (iv) the probable impact of each proposal in relation to the cumulative effect created by other existing and anticipated structures or work in the general area.

It is clear, then, that the Corps has been given the task of deciding to which uses the navigable waterways of the United States should be put. Within the range of the alternatives presented to it, the Corps must weigh all the factors mentioned above, and make a determination as to which arrangement would be most advantageous. It may maintain the present use by denying a permit; it may institute a new use by granting a permit; or it may put conditions on a permit which make the two uses compatible. This decision is ultimately reviewable by the courts under the appropriate scope and nature of review as discussed above.

The next and crucial question is: which institution—the court or the Corps—has been given the corollary question of allocating the costs of the permit decision. The plethora of environmental litigation regarding Corps permits suggests that parties have attempted to place this decision with the courts. Nevertheless wisdom suggests that, in allowing the Corps to control the use decision, Congress also allowed it to make the cost decision.

■ Although the delegation of the cost allocation decision to the Corps is not evident from the Rivers and Harbors Act or the regulations themselves, reflection requires the conclusion that

---

11. The regulation lists the following facts as relevant to consideration of the application: "conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use classifications, navigation, recreation, water supply, water quality and in general the needs and welfare of the people." 33 C.F.R. § 209.120(f)(1). Other specific areas of concern are listed at 33 C.F.R. § 209.120(1).

**356**

the Corps has been given that decision, albeit in a *de facto* manner. By virtue of its authority to grant, deny, revoke, modify and place conditions on permits, the Corps forces the users involved, private or public, to bear the cost of the final arrangement. Like the use decision, the cost decision should not be redetermined by the courts except under established procedures for review. .

■ The maintenance of a cause of action by one private party against another for injunctive relief or damages due to injury caused by a use which has already been implemented and which has received the Corps' authorization would interfere with the permit scheme established by the regulations. Under such circumstances damages which arise from the destruction of an old use in favor of a new use may not be reallocated by the courts since that decision rests solely with the Corps and is reviewable by the courts only in a limited fashion.

■ A different set of questions arises, however, where a party has acted *outside* the scheme established by the Act and the regulations.[12] Once a party has acted on a unilateral basis to change the use of a navigable waterway without submitting to Corps procedures, the use and cost decisions are taken away from the Corps by the private party. Dealing with a *fait accompli* requires a different analysis. The traditional limits within which a private cause of action may be established in these circumstances are set forth in *River & Kanawha Canal Parks, Inc. v. Richmond Metro. Auth.*, 359 F.Supp. 611 (E.D.Va. 1973) as follows:

[A] private party who suffers injury from the act of another, which act is in violation of the requirements of a federal statute, is normally entitled to civil redress for his injury, unless that statute expressly prohibits such actions or unless the maintenance of such actions would interfere with the operation of the statutory scheme. This rule of law stems from a sound public policy of allowing an innocent party to be compensated for, or otherwise protected from, harm caused to him by the illegal acts of another. It is supported by, if not actually the basis of the United States Supreme Court's opinion in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The underlying policy fails however when the illegal act performed by the defendant is in violation of a statute whose scheme of enforcement is such that it will be interfered with by allowing a private cause of action or where there is a clear congressional purpose not to allow private remedies for the violation of the statute's requirements.

359 F.Supp. at 638 (footnote omitted).

Courts have traditionally been willing to imply causes of action in favor of those injured by activity which is in breach of a standard set forth by a federal statute, when the statute or its regulations does not otherwise provide for such relief. *See generally* Note, *Implying Civil Remedies from Federal Regulatory Statutes*, 77 Harv.L.Rev. 285, 285–87. Courts should imply such a remedy when the cause of action might provide an added inducement for potential violators to conform to the laws and regulations, or when an administrative agency does not have the power to grant the re-

12. In cases where a permit has not yet been issued for proposed construction, injunctions against that construction have been allowed because they would not normally interfere with the enforcement scheme; an injunction would force the private party to submit to Corps procedures. *See, e. g., Alameda Conservation Ass'n v. California*, 437 F.2d 1087, (9th Cir.), *cert. denied*, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 649 (1971); *River & Kanawha Canal Parks, Inc. v. Richmond Metro Auth.*, 359 F.Supp. 611 (E.D.Va.), *aff'd*, 481 F.2d 1280 (4th Cir. 1973); *Natural Resources Defense Council, Inc. v. Grant*, 355 F.Supp. 280 (E.D.N.C.1973); *Sierra Club v. Leslie Salt Co.*, 354 F.Supp. 1099 (N.D.Cal.1972).

lief sought by the private party. *See id.* at 291, 294–95.

While the Corps has the authority to initiate criminal proceedings resulting in fines or imprisonment and may sue civilly for removal of structures which have been erected in violation of the provisions of section 12, 33 U.S.C. § 406, the Corps does not have the authority to compensate parties injured by those illegal activities. Therefore, while the Corps may allocate costs when it has the initial use decision, reallocation of costs after a violation should not, and does not necessarily, rest with the Corps. A private party should be able to sue under the Act for damage to interests protected by the Act, and under such limited circumstances, the courts may reallocate the costs of the unilateral use decision made by the person who violated the Act.

The case law supports this view. When activity has occurred in violation of the Rivers and Harbors Act without submission to Corps procedures, private parties injured ·by such activity have been allowed to sue under various sections of the Act. *See, e. g., Neches Canal Co. v. Miller and Vidor Lumber Co.,* 24 F.2d 763 (5th Cir. 1928); *Hawkinson v. Blandin Paper Co.,* 54 F.R.D. 517 (D.Minn.1972); *Lauritzen v. Chesapeake Bay Bridge & Tunnel Dist.,* 259 F.Supp. 633 (E.D.Va.1966), *modified on appeal,* 404 F.2d 1001 (4th Cir. 1968). *Lauritzen* is particularly analogous to the case at hand. There a permit was procured for the building of a bridge. A special condition, attached to the permit, required that the construction must not inhibit navigation. After the bridge was completed, a boat struck a submerged light structure which had been left in the water in violation of the permit. The district court concluded that because the negligent act was in violation of the permit, the regulations and the Act, a cause of action in favor of a third party could be implied because the regulations pertaining to obstructions to navigation were "manifestly intended for the protection of private parties such as the libelant here, even though the enforcement of these provisions was vested in the United States." 259 F. Supp. at 638. Although this cause of action was eliminated *sub silentio* by the Fourth Circuit in its opinion, the Court of Appeals did not strike down the claim on its merits; the district court opinion, then, remains persuasive.

Finally, since a cause of action for damages resulting from acts in violation of section 10 of the Rivers and Harbors Act exists, it remains to be decided which activities are protected by the Act. The clear weight of authority indicates that only activities which result in obstructions to navigation and anchorage are actionable. The Rivers and Harbors Act was originally enacted in response to the Supreme Court's decision in *Willamette Iron Bridge Co. v. Hatch,* 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629 (1888), which held that there was no common law of the United States which prohibited obstructions in navigable waters. Congress then enacted section 10 of the Rivers and Harbors Act of 1890, 26 Stat. 426, 454, which prohibited the creation of "any obstruction, not affirmatively authorized by law, to the navigable capacity" of the waters of the United States. That act was recodified in 1899 without any substantive changes to section 10. *See generally United States v. Republic Steel Corp.,* 362 U.S. 482, 485–87, 80 S.Ct. 884, 4 L. Ed.2d 903 (1960).

Most of the courts which have found that a cause of action for damages does not exist have *not* done so on the basis that the Act would not support such a cause of action. Rather, they have found that since the Rivers and Harbors Act was passed to prevent obstructions to navigation, even if a cause of action existed, it would only lie for damage caused *by an obstruction to navigation.* *See, e. g., H. Christiansen & Sons, Inc. v. Duluth,* 154 F.2d 205, 207–08 (8th Cir. 1946); *Guthrie v. Alabama By-Products Co.,* 328 F.Supp. 1140, 1144–49

(N.D.Ala.1971), *aff'd per curiam*, 456 F.2d 1294 (5th Cir. 1972), *cert. denied*, 410 U.S. 946, 93 S.Ct. 1352, 35 L.Ed.2d 613 (1973); *Lavagnino v. Porto-Mix Concrete, Inc.*, 330 F.Supp. 323, 325–26 (D.Colo.1971); *Chambers-Liberty Counties Navigation Dist. v. Parker Bros. & Co.*, 263 F.Supp. 602, 607 (S.D.Tex. 1967).

Certain authority suggests that the Act should protect environmental rights in addition to navigational interests. *See, Hawkinson v. Blandin Paper Co.*, 54 F.R.D. 517, 518 n.3 (D.Minn.1972), and cases cited therein. Nevertheless, since the original purpose of the Act was to protect navigation, the Act should not be tortured into interpretations which satisfy legislative needs which have not yet been fulfilled.

█ It is therefore held that insofar as the plaintiffs have alleged obstructions to the navigational capacity of St. George's Creek, they may maintain a cause of action for damages which have occurred as the result of defendants' activities conducted outside the scope of permits issued to them by the Corps of Engineers and in violation of section 10 of the Rivers and Harbors Act.

## ADMIRALTY JURISDICTION

█ Plaintiffs also allege jurisdiction of this Court over the action under 28 U.S.C. § 1333. Admiralty jurisdiction was most recently discussed in *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1973). There the Supreme Court rejected a rigid "locality" test of maritime jurisdiction in favor of a "maritime nexus" test. The latter test requires that, a tort, to be cognizable under admiralty jurisdiction, must have some significant relation to traditional maritime activity.

Although dredging and filling are not traditional maritime activities, interpre-

tation of *Executive Jet* indicates that the activity of the one injured, rather than the one injuring, must have a maritime nexus. *See, Union Oil Co. v. Oppen*, 501 F.2d 558 (9th Cir. 1974). That nexus certainly exists in relation to the Potomac River Association and the Watermen's Association insofar as injury to commercial fishing has been alleged. *Union Oil* held that fishing was clearly a traditional maritime activity and negligent conduct which interfered with that activity was actionable as a maritime tort. *See also Burgess v. Tamano*, 370 F.Supp. 247 (D.Me.1973) (oil spill injuring fishing and clamming); *Maryland v. Amerada Hess Corp.*, 350 F.Supp. 1060 (D.Md.1972); *California v. S.S. Bournemouth*, 307 F.Supp. 922 (C.D. Cal.1969); *but cf. Oppen v. Aetna Ins. Co.*, 485 F.2d 252 (9th Cir. 1973) (loss of use of pleasure boat not compensable under maritime law).

█ Assuming that a maritime tort exists for injury to commercial fishing here, two further questions must be answered. The first is whether the plaintiffs have standing to sue. Generally a public nuisance is an interference with the rights of the community at large and is punishable as a crime by the state. *See*, W. Prosser, *Law of Torts* § 88, at 586 (4th ed. 1971). But a tort for public nuisance may also be enforced by those who have been injured in a manner different than that of the injury to the general public. *See*, Prosser, *Private Action for Public Nuisance*, 52 Va. L.Rev. 997 (1966). Maryland law supports this theory. *See, e. g., Cook v. Normac Corp.*, 176 Md. 394, 4 A.2d 747 (1939).[13]

█ *Burgess v. Tamano*, 370 F. Supp. 247 (D.Me.1973), considered in detail whether commercial fishers and clammers could maintain an action for tortious invasion of public rights of fishing and navigation. That case held

---

13. As to whether general federal maritime law or Maryland law applies to determine the consequences of defendants' tortious activities, *see Union Oil Co. v. Oppen*, 501 F.2d 558, 562 (9th Cir. 1974). As that case notes, maritime law frequently uses statutes and decisional law of the states for foundation. *See id.*

that where the right to fish had in fact been exercised by the plaintiffs, they had vested expectations which had been injured differently from those of the public and which would support a private cause of action. *See*, 370 F.Supp. at 250 and cases cited therein. This reasoning is persuasive. Therefore insofar as the plaintiffs' claim alleges injury to their rights as commercial fishers, they do have standing to sue for relief.

The second and final question which must be answered is whether the five Corps permits issued to the defendants authorizing dredging and filling foreclosed recovery for public or private injury which occurred pursuant to activity under the permits. It does.

To put the question in a different light, although under some circumstances pollution of a river which results in the killing of fish may be considered a nuisance, the Corps may immunize acts which would otherwise be nuisances in much the same way as zoning under a state's police power may cause some curtailment of rights by restricting uses. *See, e. g., McMahon v. City of Dubuque*, 255 F.2d 154 (8th Cir.) *cert. denied*, 358 U.S. 833, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958).

This is merely another way of stating that the Corps of Engineers may regulate the use of navigable waters and may allocate the cost of those uses, because it has been designated the trustee of a common property resource. Once uses of the common property have been authorized, they cannot be nuisances because they have been condoned by the Government.

Nevertheless, as with the Rivers and Harbors Act, once activity occurs *outside* a Corps permit, it may then be considered a nuisance and give rise to a cause of action for damages which may be pursued by specially injured private parties.

Plaintiffs may therefore proceed to prove the extent of injury caused them by activities of the private defendants which were in violation of the Rivers and Harbors Act or which were maritime torts, and which were, in addition, outside the scope of permits previously issued to the private defendants by the Corps of Engineers. Should relief be warranted, its form will be determined at the appropriate time.

For the foregoing reasons, it is this 11th day of April, 1975, by the United States District Court for the District of Maryland, ordered:

1. That the motion of the federal defendants be, and the same is, hereby granted, except that jurisdiction of the Court will be retained over the federal defendants until further order of the Court; and

2. That the motion of the private defendants be, and the same is, hereby denied.