# STATE OF MICHIGAN

# COURT OF APPEALS

MARK GOTTLEBER and ROSE GOTTLEBER,

       Plaintiff-Appellants,

v

COUNTY OF SAGINAW,

       Defendant-Appellee.

UNPUBLISHED
June 12, 2018

No. 336011
Bay Circuit Court
LC No. 12-003406-CZ

Before: SAWYER, P.J., and CAVANAGH and FORT HOOD, JJ.

PER CURIAM.

In this inverse condemnation action, plaintiffs appeal as of right the trial court's order granting defendant's motion for summary disposition. We reverse and remand for proceedings consistent with this opinion.

## I. FACTS AND BACKGROUND

### A. THE GOTTLEBER PROPERTY

Since 1994, plaintiffs have owned a 93-acre parcel of land that is directly adjacent to the Saginaw River (hereinafter, "the Gottleber property"). Plaintiffs farmed the property until 2006, when they leased the property to a tenant who continued to farm the land until 2009. Plaintiffs' expert witness, Rick Harding, Ph.D., testified that the land upon which the Gottleber property is located would naturally be a wetland if it were not "pumped" and drained in order to use it for farming. Both Harding and Russel Beaubien, an expert witness for defendant, explained that the Gottleber property and the surrounding properties were hydraulically connected to the Saginaw River through groundwater. Harding stated that if one of the farms neighboring the Gottleber property had stopped pumping or draining water from its own land, that would have affected how much plaintiffs would have to pump in order to farm because the Gottleber property and the surrounding areas are "all connected" through the groundwater system. He stated that the amount of water on the Gottleber property historically depended on various contributing factors, including the changing groundwater levels affected by the Saginaw River. Harding specifically stated that the amount of water on the Gottleber property depended on "the groundwater elevations, whether the river is charged, recharging, discharging and whether or not there's been pumpage here. It all depends on the dynamics of who's pumping and who's discharging/recharging[,] rain events and so on. It's all about the groundwater."

-1-

Mark Gottleber testified that in order for the Gottleber property to be farmed, it had to be pumped every April and May, and the property was sometimes pumped at other times depending on rainfall. Further, according to the former Saginaw County Drain Commissioner, James Koski, all of the farms in the area surrounding the Gottleber property were pumped to farm. The two farm parcels abutting the Gottleber property, which were eventually purchased by defendant to use as the site for a Dredged Material Disposal Facility (DMDF) and a Wetland Mitigation Area (WMA), also had tile drainage systems and were pumped in order to be used as farms.

## B. THE DREDGED MATERIALS DISPOSAL FACILITY AND THE WETLAND MITIGATION AREA

The Gottleber property is adjacent to the DMDF and the WMA, and is located between 1) the DMDF and the WMA and 2) the Saginaw River. Koski testified that the DMDF was the idea of the United States Army Corps of Engineers (USACE), but the property upon which the DMDF is located is owned by defendant. Koski stated that the DMDF was built to be a "disposal facility" for the water and soil that was dredged from the Saginaw River, and that dredging was done in order to keep the Saginaw River open to navigation.

The Project Cooperation Agreement (hereinafter "PCA") between the USACE and defendant details the proposals for the DMDF's construction, operation, and maintenance. The PCA designates defendant as the "non-federal sponsor" of the DMDF project and also directs defendant to "provide all lands, easements, and rights-of-way that the Government [i.e., the USACE] determines the Non-Federal Sponsor must provide for construction or operation and maintenance of the *general navigation features*, including . . . the disposal of dredged or excavated material associated therewith." The PCA further provides that the USACE would select the land for the DMDF site, and defendant would then "acquire" and "provide" that land. The PCA states that the USACE would construct, operate, and maintain the DMDF.

A Michigan Department of Environmental Quality (MDEQ) permit was issued to defendant for the design, construction, and maintenance of the DMDF. The permit states, "Site runoff shall be directed to public or natural drainage ways and not unnaturally [be] discharged onto adjacent properties. Permittee is cautioned that grade changes resulting in increased runoff onto adjacent property is subject to civil damage litigation." The permit further states that it does not "authorize any injury to private property or invasion of public or private rights," and does not "prejudice or limit the right of a riparian owner or other persons to institute proceedings in any circuit court of this state when necessary to protect his rights."

Although the federal regulatory scheme did not require any wetland mitigation for the DMDF project, the MDEQ required it. Thus, as part of the permitting process to get the DMDF constructed, MDEQ required defendant to create a Wetland Mitigation Area. Beaubien testified that the purpose of the WMA was "to create a wetland area to mitigate the land that was utilized in the DMDF, turn it back to a wetland area." Beaubien stated that the land that was chosen for the WMA was historically pumped by the farmers who owned it, and the WMA was created by "ceasing to pump in that area." The WMA is owned and managed solely by defendant.

At the direction of the USACE and pursuant to the PCA, defendant purchased two farm parcels abutting the Gottleber property to use as the site for the DMDF project. The land

formerly occupied by the two farms now contains the DMDF, which is completely surrounded by the WMA. Also, a railroad grade made out of soil separates the WMA from the Gottleber property.

## C. FLOODING OF THE GOTTLEBER PROPERTY AND THE TRIAL COURT'S RULING

Plaintiffs claim that beginning in 2009, the DMDF and/or the WMA caused flooding on the Gottleber property every year because water was overflowing from the WMA onto their property. Dr. Harding opined in his Integrated Environmental, Inc. report that the "construction and presence of the [DMDF] and cessation of dewatering activities, and the creation and presence of the wetland mitigation area, have contributed to flooding of the Gottleber farm." Harding further stated in his report that the railroad grade separating the WMA from the Gottleber property was impermeable and allowed water to leak through it and travel onto the Gottleber property. Harding further described in his report that the accumulation of water in the WMA led to flooding of the Gottleber property:

> Before the creation of the Wetland Mitigation Area, groundwater elevation dated from June 5 to 9, 2005 indicate a groundwater elevation in the range of 579.3 to 580.2 feet NGVD29 for groundwater monitoring well US-13-05 located outside of the Facility berm within the mitigation wetland area adjoining the Gottleber farm to the east [citation omitted]. Increasing the mitigation wetlands area groundwater elevation to the design elevation of 581 feet results in an increase of groundwater elevation of 0.8 to 1.7 feet at this location. This is significant in terms of the likelihood of causing water to pond at the surface and increases the hydraulic pressure on the railroad bed located between the Wetland Mitigation Area and the Gottleber farm, thus promoting seepage of water through and/or beneath the railroad bedding material and onto the Gottleber Farm.

Harding also stated that the construction of the DMDF changed the drainage conditions of the area because the clay berms/dike surrounding the DMDF prevent groundwater from flowing west of the WMA toward the facility, which causes the groundwater to flow toward the Gottleber property instead:

> The above-noted dike was designed to hydraulically isolate the Facility from the surrounding land including the Wetland Mitigation Area. The drain tiles in the area of the aforementioned dike were removed as part of the Facility construction. Following construction of the Facility, dewatering ceased allowing for the ground/surface water elevation in the wetlands mitigation area to rise. Therefore, ground/surface water which accumulates in the Wetland Mitigation Area on the west side of the railroad bed cannot move to the west, away from the Gottleber Farm, as it did prior to the construction of the Facility.

Harding could not determine how much of the additional water flowing onto the Gottleber property was specifically attributable to the DMDF and/or the WMA. Harding also could not determine how much water would have moved west of the WMA prior to the construction of the DMDF or how much the DMDF has changed the water flow in that regard.

-3-

He also could not say to what extent possible seepage across the railroad grade had contributed to the accumulation of water on the Gottleber property.

Gottleber stated that after his property was flooded in 2009, he stopped pumping water from his property because it was expensive to pump and he did not want to pump the "facility's water." Plaintiffs state that the flooding on their property has prevented them from using the property for any economically beneficial uses, including leasing, selling, developing, or farming.

In granting defendant's motion for summary disposition, the trial court reasoned that the DMDF was a federal project and defendant therefore had "no liability whatsoever regarding that project," although the trial court noted that it did believe that the DMDF contributed to the flooding on the Gottleber property. The trial court also stated that even though the WMA was a "separate project" completed solely by defendant, defendant's cessation of pumping the water in the WMA did not constitute an "affirmative act necessary to create liability" for defendant.

## II. STANDARD OF REVIEW

The trial court's decision to grant or deny a party's motion for summary disposition is reviewed de novo. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 205; 815 NW2d 412 (2012). While defendant moved for summary disposition pursuant to MCR 2.116(C)(7), (8) and (10), a review of the trial court's ruling from the bench and resulting order reflect that the trial court determined that genuine issues of material fact did not exist to warrant trial where plaintiffs could not make out a claim of inverse condemnation against defendant. Accordingly, we review the trial court's decision granting summary disposition in favor of defendant as having been granted pursuant to MCR 2.116(C)(10). A motion under MCR 2.116(C)(10) "tests the factual sufficiency of the complaint[.]" *Joseph*, 491 Mich at 206. Summary disposition pursuant to MCR 2.116(C)(10) "is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). In considering the motion, the trial court "must consider the affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Joseph*, 491 Mich at 206. All reasonable inferences are to be drawn in favor of the nonmoving party. *Dextrom v Wexford Co*, 287 Mich App 406, 415; 789 NW2d 211 (2010).

## III. ANALYSIS

On appeal, plaintiffs contend that the trial court erred in concluding that (1) defendant was not a proper party to this lawsuit and (2) the record evidence did not support a finding that defendant engaged in affirmative actions aimed at the Gottleber property to establish a claim of inverse condemnation. We agree.

The trial court's determination that defendant was not a proper party dovetails with the question whether plaintiffs presented record evidence to establish a claim of inverse condemnation against defendant. Accordingly, we analyze both issues together. Const 1963, art 10, § 2 provides that "[p]rivate property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law." As this

Court recently recognized in *Mays v Snyder*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket Nos. 335555, 335725, 335726); slip op at 35:

> a plaintiff alleging a de facto taking or inverse condemnation must establish (1) that the government's actions were a substantial cause of the decline of the property's value and (2) *that the government abused its powers in affirmative actions directly aimed at the property.* [Quotation marks and citation omitted; emphasis added.]

In the trial court, as in this Court, defendant argues that summary disposition in its favor was appropriate where it was not the party responsible for the alleged taking of plaintiffs' property. Instead, defendant casts all responsibility on the USACE, claiming that defendant itself did not undertake the affirmative actions necessary to sustain a claim for inverse condemnation. Put another way, defendant argues that it was not the specific actions of defendant, specifically aimed at plaintiffs' property, that limited the use of plaintiffs' property to the extent that a taking can be said to have occurred in contravention of Const 1963, art 10, § 2. See *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club,* 283 Mich App 264, 295; 769 NW2d 234 (2009). Instead, defendant points to the USACE as the culpable party, and points out in its brief on appeal, that "[i]n determining whether a taking occurred, the form, intensity, and deliberateness of the governmental actions toward the injured party's property must be examined." *Id*. However, this Court has recognized that a taking of private property may occur where private property is flooded, or excess surface water is diverted to the private property. *Wiggins v Burton*, 291 Mich App 532, 572; 805 NW2d 517 (2011).

The thrust of defendant's contention that it is not a proper defendant is that the USACE is the proper defendant because the DMDF was strictly a federal project over which defendant had no control, and the WMA was only required because of the federally operated DMDF.

> In our federal system, it is not uncommon for federal and state governments jointly to be involved in actions directed at improving the public welfare. When these actions give rise to potential liability under the Fifth Amendment's takings clause, it is necessary for the courts to determine whether the federal government, the state, or both should be deemed the responsible party. [*Pendleton v United States*, 47 Fed Cl 480, 485 (2000) (finding that a state entity and not the federal government was the proper defendant in a takings claim resulting from actions taken pursuant to state approved reclamation programs under federal law).]

The record evidence establishes that the USACE managed, operated, and maintained the DMDF. However, defendant was the "non-federal sponsor" of the DMDF project and was required to acquire and provide the land for the DMDF site, which it did. Defendant is also the permittee of the MDEQ permit that was issued for the DMDF. Notably, June 21, 2000 correspondence from the MDEQ to the USACE that defendant included in support of its motion for summary disposition reflects that the DMDF project was initiated at the request of the state of Michigan, Bay County, and defendant where the "restricted navigational depths" in the Saginaw River were having an "adverse economic impact on Bay and Saginaw Counties." Additionally, the operational management plan for the DMDF provides that defendant and the USACE will jointly conduct an annual inspection of the DMDF. Moreover, article II(A)(1) of the September

28, 2005 PCA between the USACE and defendant reserved the right to defendant to review and comment on "solicitations for all contracts, including relevant plans and specifications" for the construction of the DMDF. Article II(F) of the same agreement states that defendant was responsible for 10% of the total costs of construction. Therefore, although defendant argues that it is not a proper party because the DMDF was a federal project over which defendant had no control, the record belies this claim, where defendant was involved in the project from its initiation, and where it selected and now owns the land upon which the DMDF is located.

Further, the WMA, which is where plaintiffs allege the water flooding their property is coming from, is solely owned and managed by defendant. Defendant turned off the water pumps and removed the draining tiles in the WMA land in order to create the WMA, and plaintiffs allege that the cessation of pumping and draining the water in the WMA land resulted in the flooding of their property. Defendant's selection and ownership of the land for the DMDF and its ownership and control of the WMA sufficiently establish that defendant was involved in and had a substantial role in flooding the Gottleber property. Beaubien testified that defendant turned off the water pumps in the WMA land to flood that land and create the WMA. Plaintiffs argue that turning off the pumps in the WMA land constituted an affirmative act sufficient for inverse condemnation purposes that resulted in the flooding of their property. Gottleber testified that in order for the Gottleber property to be farmed, it had to be pumped every April and May, and sometimes at other times, depending on rainfall. Koski testified that all of the farms in the area surrounding the Gottleber property were pumped to farm. The two farm parcels abutting the Gottleber property, which were eventually purchased by defendant to use as the site for the DMDF and WMA, had tile drainage systems and were pumped in order to be used as farms. As part of the construction for the WMA (i.e., to help flood the WMA land), defendant removed the tile drainage systems on the WMA land that were previously used by the farmers to help drain the water on their land. Plaintiffs allege that since defendant removed the tile drainage systems and stopped pumping the water on the WMA land, the flooding on the Gottleber property has been more frequent and at a higher level than what it used to be prior to the DMDF and WMA being created.

Although "inaction and omissions by the state cannot be found to constitute a taking," *Attorney Gen v Ankersen*, 148 Mich App 524, 562; 385 NW2d 658 (1986), the record evidence confirms that defendant did more than simply stop pumping water to create the WMA—it also removed the tile draining systems that were previously on the WMA land. Put another way, even though defendant's cessation of pumping may not be considered an affirmative action in itself, see *Ankersen*, 148 Mich App at 562, defendant's removal of the tile drainage systems was a deliberate and overt action that was more than mere inaction or omission. Thus, defendant's removal of the tile draining system, along with its cessation of pumping the water on the WMA land, which had been historically pumped and drained and which plaintiffs had relied on to be pumped and drained, constituted an affirmative action sufficient for inverse condemnation liability purposes.[1]

---

[1] While defendant argues that it had no legal duty or obligation to continue pumping and draining the water on the WMA land in order to sustain a particular groundwater level for plaintiffs'

Asserting that plaintiffs cannot make out a claim of inverse condemnation against it, defendant claims that the record evidence fails to support a conclusion that its actions were a substantial cause of the Gottleber property flooding. *Froling Trust*, 283 Mich App at 295. The parties dispute the cause of the flooding, and both parties presented experts to testify regarding the cause of the flooding. Specifically, Harding opined that the WMA was a substantial cause of the Gottleber property flooding. Conversely, defendant asserts that plaintiffs failed to provide any evidence regarding how much of the flooding of the Gottleber property is attributable to the WMA and therefore can only speculate as to whether the WMA is a substantial cause of the flooding. The party opposing a motion for summary disposition has the burden to present "evidence establishing the existence of a material factual dispute." *Smith v Globe Life Ins Co,* 460 Mich 446, 455; 597 NW2d 28 (1999). Further, "[p]arties opposing a motion for summary disposition must present more than conjecture and speculation to meet their burden of providing evidentiary proof establishing a genuine issue of material fact." *Fields v Suburban Mobility Auth*, 311 Mich App 231, 237-238; 874 NW2d 715 (2015) (internal quotation marks and citation omitted).

A review of the record demonstrates that plaintiffs offered far more than mere speculation regarding the cause of the flooding. Again, plaintiffs allege that since defendant has removed the tile drainage systems and stopped pumping the water on the WMA land, the flooding on the Gottleber property has been more frequent, and at a higher level, than before the DMDF and WMA were created. Notably, Harding testified that if one of the farms neighboring the Gottleber property had stopped pumping or draining water from its own land, that would have affected how much Gottleber would have to pump in order to farm because the Gottleber property and the surrounding areas are "all connected" through the groundwater system. He also testified that the amount of water on the Gottleber property historically depended on various contributing factors, including the changing groundwater levels affected by the Saginaw River. Harding specifically stated that the amount of water on the Gottleber property depended on "the groundwater elevations, whether the river is charged, recharging, discharging and whether or not there's been pumpage here. It all depends on the dynamics of who's pumping and who's discharging/recharging[,] rain events and so on. It's all about the groundwater." Further, Harding's report addressed in detail that the WMA and DMDF were substantial causes of the

_____

benefit, the issue that we must decide is whether defendant's actions or inaction support a claim of inverse condemnation. At most, defendant's argument that it had no duty to pump its own property to maintain lowered water levels goes to whether genuine issues of material fact exist concerning whether defendant's cessation of pumping and draining was "directly aimed at plaintiff[s'] property." *Marilyn Froling Revocable Living Trust,* 283 Mich App at 294-295. Indeed, although defendant asserts that "plaintiffs have no legally enforceable right to require defendant to continue the artificial draining and pumping of its land," it is unclear whether defendant was aware that its removal of the draining tiles and cessation of pumping would directly affect the Gottleber property by increasing the groundwater levels in the area. Considering the complexity of the facts and the existing record evidence concerning whether defendant's actions were "directly aimed" at the Gottleber property, there were genuine issues of material fact that should be submitted to and determined by the jury.

Gottleber property flooding because they affected the groundwater levels in the surrounding area, the DMDF restricted the flow of water from the WMA to the west, and the water flooding the Gottleber property came from the WMA. In sum, Harding's testimony and report raise genuine issues of material fact concerning causation. Therefore, whether defendant's removal of the draining tiles and cessation of pumping on the WMA were substantial causes of the flooding is a factual question for the jury's consideration and decision.

Finally, to the extent that defendant claims that it is immune from liability[2] where it acted under the supervision of, or with USACE, we disagree. As defendant notes in its brief on appeal, the United States Congress has control over navigable waterways pursuant to the Commerce Clause of the United States Constitution and has conferred discretionary authority for the maintenance and improvement of navigable water ways, including dredging, to the USACE. *US v Twin City Power Co,* 350 US 222, 224-225; 76 S Ct 259; 100 L Ed 240 (1956); *Williams v United States*, 321 Fed Appx 129, 133 (2009); 33 USC § 622(a). In support of its assertion that it is immune from liability, defendant points to the United States Court of Appeals for the Sixth Circuit's decision in *Landowski v Grand Trunk Western Railroad Co*, 822 F2d 600, 601 (CA 6, 1987), where the Court upheld the district court's granting of summary disposition in favor of the defendant railroad of the plaintiffs' nuisance claim where the defendant railroad had acted pursuant to a permit issued to it by the federal government. In so ruling, the *Landowski* Court favorably quoted language from *Potomac River Ass'n, Inc v Lundeberg Maryland Seamanship School, Inc,* 402 F Supp 344 (D Maryland, 1975), stating that under certain circumstances, third parties may be immunized from liability while acting at the behest of the USACE. *Landowski*, 822 F2d at 603. In *Potomac River Ass'n*, the plaintiffs had filed an action against the USACE and a private company arising from the dredging of a creek in Maryland, alleging that (1) the USACE and the third party acted pursuant to federal permits that should not have been issued and (2) the USACE and the third party's actions exceeded the scope of the permits. *Landowski*, 822 F2d at 602. Where the dredging was conducted pursuant to a federal permit procedure, the *Potomac River Ass'n* Court concluded that allowing the suit to proceed against the third party where it had already received federal legislative authorization "would interfere with the permit scheme established by the [federal] regulations." *Id*. at 603, quoting *Potomac River Ass'n*, 402 F Supp at 356. The *Potomac River Ass'n* Court also determined that where the third party acted pursuant to the federal permit issued by the USACE, it could not be held liable under a nuisance theory. *Landowski*, 822 F2d at 603, quoting *Potomac River Ass'n*, 402 F Supp at 356.

The *Landowski* Court ultimately rested its decision on what it found to be more persuasive authority from the United States Supreme Court, *Southern Pacific Co v Olympian Dredging Co*, 260 US 205; 43 S Ct 26; 67 L Ed 2d 213 (1922), specifically on grounds not relevant here. Notably, both *Potomac River Ass'n* and *Landowski* are factually distinguishable from this case, but for purpose of our analysis in this opinion, it is more significant that our

---

[2] Defendant is not entitled to governmental immunity for a claim alleging inverse condemnation in violation of the state constitution. *Co Rd Ass'n of Mich v Governor*, 287 Mich App 95, 121; 782 NW2d 784 (2010) (recognizing the general principle that governmental immunity cannot be claimed in a state court action where the plaintiff alleges a violation of the state constitution).

reading of *Landowski* and *Potomac River Ass'n* does not yield any indication that these opinions stand for the broad proposition of law that defendant promulgates here: that parties in any manner participating in projects that involve the USACE are automatically immunized from liability. Therefore, we disagree with defendant that it is immune from liability under the circumstances of this case.

## IV. CONCLUSION

We reverse the trial court's order granting summary disposition in favor of defendant and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. Plaintiffs, as the prevailing parties, may tax costs pursuant to MCR 7.219.

/s/ David H. Sawyer
/s/ Mark J. Cavanagh
/s/ Karen M. Fort Hood